**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

**TONYA BAUER**, **STEPHANIE KINGSBORO**, and **MICHELLE LYON**, on behalf of themselves and all others similarly situated,

*Plaintiffs*,

v.

**ANGMAR MEDICAL HOLDINGS, INC.** d/b/a **ANGMAR MANAGEMENT SERVICES**,

*Defendant*.

Case No. 4:26-cv-00996

**DEMAND FOR JURY TRIAL**

# CONSOLIDATED CLASS ACTION COMPLAINT

Tonya Bauer, Stephanie Kingsboro, and Michelle Lyon ("Plaintiffs"), through their attorneys, individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendant AngMar Medical Holdings, Inc. d/b/a AngMar Management Services ("AngMar" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiffs allege the following on information and belief—except as to their own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1. This class action arises from Defendant's failure to protect highly sensitive data.

2. Defendant is a privately held healthcare management company that provides business, clinical, operational, and administrative support to home health and hospice companies across eleven (11) states.[1]

3. As such, Defendant stores a litany of highly sensitive personally identifiable information ("PII") and protected health information ("PHI")—together "PII/PHI"—about its patients. Despite its inarguable duty to protect such sensitive information, Defendant lost control over that data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

4. The Data Breach was the result of a targeted cyberattack by cybercriminals.

5. It is unknown for precisely how long the cybercriminals had access to Defendant's network before the breach was discovered. In other words, Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to its patients' PII/PHI.

6. Indeed, due to the nature of the data stolen, the Data Breach places these individuals in the unfortunate position of being at perpetual risk of identity theft and fraud for the rest of their lives.

7. On information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect Plaintiffs' and the Class's PII/PHI. In short, Defendant's failures placed Plaintiffs' and the Class's PII/PHI in a vulnerable position—rendering them easy targets for cybercriminals.

---

[1] *About us*, ANGMAR MANAGEMENT SERVICES, https://www.angmarms.com/about (last visited Oct. 16, 2026).

8. Defendant could have prevented or mitigated the consequences of the Data Breach by implementing spam filters and anti-phishing software to detect and prevent phishing attempts, training employees to detect and report phishing attempts, implementing multi-factor authentication, employing software to detect unauthorized intrusions and the transfer of large volumes of data to third party networks, and disconnecting legacy servers containing PII/PHI from internet access and implementing clearing house practices to delete data it was no longer required to maintain. Defendant was negligent for failing to use these reasonable and industry standard data security measures.

9. On information and belief, Plaintiffs are Data Breach victims. They bring this class action on behalf of themselves and all others harmed by Defendant's misconduct.

10. The exposure of one's PII/PHI to cybercriminals is a bell that cannot be unrung. Before this Data Breach, Defendant's patients' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

**PARTIES**

11. Plaintiff Tonya Bauer is a natural person and a citizen of Albert, Kansas. She is domiciled in Kansas, where she intends to remain.

12. Plaintiff Stephanie Kingsboro is a natural person and a citizen of Huron, Ohio. She is domiciled in Ohio, where she intends to remain.

13. Plaintiff Michelle Lyon is a natural person and a citizen of Oklahoma City, Oklahoma. She is domiciled in Oklahoma, where she intends to remain.

14. Defendant AngMar Medical Holdings, Inc. d/b/a AngMar Management Services is incorporated in Texas with its principal place of business at 2301 FM 1187, Suite 203, Mansfield, Texas 76063.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2), because this is a class action involving more than one hundred putative Class Members and the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs. And minimal diversity is established because Plaintiffs and Defendant are citizens of different states.

16. This Court has general personal jurisdiction over Defendant because Defendant's principal place of business and headquarters are in Texas. Moreover, Defendant regularly conducts substantial business in Texas.

17. Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) because a substantial part of the events giving rise to the claims emanated from activities within this District, and Defendant conducts substantial business in this District.

## BACKGROUND

***Defendant Collected and Stored the PII/PHI of Plaintiffs and the Class***

18. Defendant is a privately held healthcare management company that provides business, clinical, operational, and administrative support to home health and hospice companies across eleven (11) states.[2]

19. As part of its business, Defendant receives and maintains the PII/PHI of thousands of its patients.

20. In collecting and maintaining the PII/PHI, Defendant agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their PII/PHI and would not have

---

[2] *About us*, ANGMAR MANAGEMENT SERVICES, https://www.angmarms.com/about (last visited Oct. 16, 2026).

provided their PII/PHI to Defendant absent a mutual understanding that Defendant would implement reasonable and industry standard data security practices.

21. Indeed, under state and federal law, businesses like Defendant have duties to protect their patients' PII/PHI and to notify them about breaches.

***Defendant's Data Breach***

22. On or around August 11, 2026, various cybersecurity journalists and other organizations that monitor dark web activity reported that the cybercriminal group known as "Interlock" announced that it had hacked Defendant.[3][4]

23. Interlock's post displays what appears to be a list of files that it claims to have exfiltrated from Defendant's network.[5] A screenshot is provided below.

---

[3] *AngMar Companies*, RANSOMWARE.LIVE, https://www.ransomware.live/id/QW5nTWFyIENvbXBhbmllc0BpbnRlcmxvY2s (last visited Oct. 16, 2026).

[4] *Interlock,* RANSOMLOOK.IO, https://www.ransomlook.io/group/interlock *(last visited Oct. 16, 2026).*

[5] *Id.*

| Name | Size |
|---|---|
| Accounting (30.7GB) | Folder |
| Advertising (1008.6MB) | Folder |
| Agency Payroll Rates (2.6MB) | Folder |
| Backups (19.4GB) | Folder |
| BranchOffice (95.1GB) | Folder |
| Clinical (2.9GB) | Folder |
| Compliance (4.3GB) | Folder |
| Corporate Creative (120.8GB) | Folder |
| Development (190.6MB) | Folder |
| Finance (27.6GB) | Folder |
| HOH (147.9KB) | Folder |
| Home (106.0GB) | Folder |
| Hospice Performance (114.9KB) | Folder |
| HR (7.2GB) | Folder |
| HR Reports (362.1MB) | Folder |
| Legal and HR (131.7MB) | Folder |
| Marketing (5.7MB) | Folder |
| Payroll (23.0GB) | Folder |
| Realty (929.7MB) | Folder |
| Region 1 (411.9MB) | Folder |
| Region 2 (383.8MB) | Folder |
| Region 3 (393.7MB) | Folder |
| Region 4 (524.2MB) | Folder |
| Region 5 (497.3MB) | Folder |
| Region 6 (443.7MB) | Folder |
| Reimbursement (23.0GB) | Folder |
| Senior Management (189.6MB) | Folder |
| Shared (208.9GB) | Folder |
| Site Audits (35.1MB) | Folder |
| SQL (3.1GB) | Folder |
| Tax (8.6GB) | Folder |
| Users (20.2GB) | Folder |
| DATA_INFO | 20 B |
| tree | 62.61 MB |
| Full Size: 62.61 MB File: 2 Folder: 32 | |

24. Worryingly, Interlock's post also alleges that it has leaked 710 GB of confidential information, including patient data, medical records, medical histories, Social Security numbers, home addresses, phone numbers, and other personal information.[6]

25. Once the data is exfiltrated from a network, its confidential nature is destroyed and it should be "assume[d] it will be traded to other threat actors, sold, or held for a second/future extortion attempt."[7] And even where companies pay for the return of data attackers often leak or sell the data regardless because there is no way to verify copies of the data are destroyed.[8]

---

[6] *Id.*
[7] 2020 Ransomware Marketplace Report, available at https://www.coveware.com/blog/q3-2020-ransomware-marketplace-report
[8] *Id.*

26. The FBI, the National Security Agency, the Multi-State Information Sharing and Analysis Center, and the Cybersecurity and Infrastructure Agency ("CISA") uniformly agree that ransom payments do not ensure the safety of compromised data. For this reason, "[t]he FBI does not support paying a ransom in response to a ransomware attack" because doing so "doesn't guarantee you or your organization will get any data back."[9]

27. As explained by the global cybersecurity firm BlackFog, the modus operandi of cybercriminals is to exfiltrate private information through a data breach and then "post it on forums on the Dark Web where it will be sold for profit."[10]

28. In short, Plaintiffs' and the Class's sensitive information has already been exposed to unauthorized third-parties (the cybercriminals who perpetuated the Data Breach) and, upon information and belief, has also been exposed to others on the dark web.

29. Defendant has made no public statements regarding Interlock or whether it paid a ransom demand.

30. However, on information and belief, even if Defendant made a ransom payment, there is, as described above, no guarantee that the data Interlock stole will be deleted.[11]

31. The stolen PII/PHI is valuable and can easily be sold to another threat actor, so there is little incentive to delete it.[12]

---

[9] *Ransomware*, FBI, at https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/ransomware

[10] Brenda Robb, *After the Data Breach – What Happens to Your Data*, BlackFog (July 27, 2025) https://www.blackfog.com/after-the-data-breach-what-happens-to-your-data/.

[11] *Steve Adler, Majority of Ransomware Victims That Pay a Ransom Suffer a Second Attack,* HIPAA JOURNAL (Feb. 23, 2024), https://www.hipaajournal.com/majority-of-ransomware-victims-that-pay-a-ransom-suffer-a-second-attack/.

[12] *Id.*

32. Cybercriminal groups can therefore monetize stolen PII/PHI and sell it on the dark web as part of a full identity profile. Buyers can then use that information to conduct different types of identity theft or fraud, such as filing a fake tax return, applying for a fraudulent mortgage, or opening a bank account while impersonating the victim.[13]

33. As is evident, Defendant cannot and has not denied that there was unauthorized access to the sensitive PII/PHI of Plaintiffs and Class Members.

34. Worse still, Defendant has yet to provide direct written notice to Plaintiffs and Class Members that their PII/PHI was taken without authorization, leaving them unaware of the need to take prompt action to protect themselves from further harm.

35. Because of the Data Breach and Defendant's failure to provide proper and timely notice, Plaintiffs and Class Members are, and will remain, at risk that their data will be illegally used immediately and in the future.

36. And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the dark web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[14]

37. Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiffs' and the Class's PII/PHI. Cybercriminals can cross-reference the data stolen from the Data Breach and combine it with other

---

[13] *Id.*

[14] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiffs' and the Class's financial accounts.

38. As explained by the global cybersecurity firm BlackFog, the modus operandi of cybercriminals like Interlock is to exfiltrate private information through a data breach and then "post it on forums on the Dark Web where it will be sold for profit."[15]

39. Indeed, the Federal Trade Commission has explained that "data stolen from businesses ends up on the dark web where criminals buy and sell it to commit fraud, get fake identity documents, or fund their criminal organizations."[16]

40. Thus, on information and belief, the PII/PHI of Plaintiffs and the Class has already been leaked or sold by Interlock on the dark web or will be leaked or sold imminently by Interlock on the dark web.

***Plaintiffs' Experiences and Injuries***

<u>Tonya Bauer's Experiences</u>

41. Plaintiff Tonya Bauer is a current patient of Defendant.

42. Thus, Defendant obtained and maintained Plaintiff Bauer's PII/PHI, including at least her name, date of birth, Social Security number, medical records, health insurance information, contact information, and address.

43. As a result, Plaintiff Bauer was injured by Defendant's Data Breach.

---

[15] Brenda Robb, *After the Data Breach – What Happens to Your Data*, BLACKFOG (July 27, 2025) https://www.blackfog.com/after-the-data-breach-what-happens-to-your-data/.

[16] John Krebs, *The dark web: What your business needs to know*, FED. TRADE COMM. (Oct. 17, 2017) https://www.ftc.gov/business-guidance/blog/2017/10/dark-web-what-your-business-needs-know.

44. Plaintiff Bauer is very careful about the privacy and security of her PII/PHI. She does not knowingly transmit her PII/PHI over the internet in an unsafe manner. She is careful to store any documents containing her PII/PHI in a secure location.

45. Plaintiff Bauer provided her PII/PHI to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Bauer's PII/PHI and has a continuing legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure.

46. Plaintiff Bauer reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of PII/PHI.

47. Through its Data Breach, Defendant compromised Plaintiff Bauer's PII/PHI.

48. Thus, on information and belief, Plaintiff Bauer's PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

49. Plaintiff Bauer has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft.

50. And in the aftermath of the Data Breach, Plaintiff Bauer suffered from a spike in spam and scam emails, text messages, and phone calls.

51. Plaintiff Bauer fears for her personal financial security and worries about what information was exposed in the Data Breach.

52. Because of Defendant's Data Breach, Plaintiff Bauer has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Bauer's injuries are precisely the type of injuries that the law contemplates and addresses.

53. Plaintiff Bauer suffered actual injury from the exposure and theft of her PII/PHI—which violates her rights to privacy.

54. Plaintiff Bauer suffered actual injury in the form of damages to and diminution in the value of her PII/PHI. After all, PII/PHI is a form of intangible property—property that Defendant was required to adequately protect.

55. As a current patient, Plaintiff Bauer suffered actual injury and lost the "benefit of the bargain" because Plaintiff Bauer paid Defendant for medical services and reasonable data security—but Defendant then cut corners and declined to provide the bargained-for data security. After all, if Defendant was transparent about its deficient data security, then Plaintiff Bauer (1) would have either declined to become a patient of Defendant and would have taken her business to a competitor of Defendant, or (2) would have become a patient of Defendant only if Defendant reduced its prices to account for the deficient data security.

56. Plaintiff Bauer suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Bauer's PII/PHI right in the hands of criminals.

57. Because of the Data Breach, Plaintiff Bauer anticipates spending considerable amounts of time and money to try and mitigate her injuries.

58. Today, Plaintiff Bauer has a continuing interest in ensuring that her PII/PHI—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

<u>Stephanie Kingsboro' Experience</u>

59. Plaintiff Stephanie Kingsboro is a former employee of Defendant.

60. Thus, Defendant obtained and maintained Plaintiff's PII/PHI, including at least her name, date of birth, Social Security number, health insurance information, contact information, and address.

61. As a result, Plaintiff was injured by Defendant's Data Breach.

62. Plaintiff is very careful about the privacy and security of her PII/PHI. She does not knowingly transmit her PII/PHI over the internet in an unsafe manner. She is careful to store any documents containing her PII/PHI in a secure location.

63. Plaintiff provided her PII/PHI to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII/PHI and has a continuing legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure.

64. Plaintiff reasonably understood that a portion of the funds paid to Defendant and/or derived from her employment would be used to pay for adequate cybersecurity and protection of PII/PHI.

65. Through its Data Breach, Defendant compromised Plaintiff's PII/PHI.

66. Thus, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

67. Plaintiff has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft.

68. And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam emails, text messages, and phone calls.

69. Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach.

70. Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

71. Plaintiff suffered actual injury from the exposure and theft of her PII/PHI—which violates her rights to privacy.

72. Plaintiff suffered actual injury in the form of damages to and diminution in the value of her PII/PHI. After all, PII/PHI is a form of intangible property—property that Defendant was required to adequately protect.

73. As an employee, Plaintiff suffered actual injury and lost the "benefit of the bargain" because Plaintiff Defendant benefitted from (1) using their PII/PHI to provide services and/or facilitate employment, and (2) accepting payment and/or using their labor to derive profit—but Defendant then cut corners and declined to provide the bargained-for data security. After all, if Defendant was transparent about its deficient data security, then Plaintiff (1) would have either declined to become an employee of Defendant and would have taken her business to a competitor of Defendant, or (2) would have become an employee of Defendant only if Defendant reduced its prices to account for the deficient data security.

74. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII/PHI right in the hands of criminals.

75. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate her injuries.

76. Today, Plaintiff has a continuing interest in ensuring that her PII/PHI—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

Michelle Lyon's Experience

77. Plaintiff Michelle Lyon is a former employee of Angels Care Home Health, an AngMar Managed Company, which obtained Plaintiff's PII/PHI in the course of its regular business operations.

78. Upon information and belief, at the time of the Data Breach, Defendant maintained Plaintiff's PII/PHI in its system, to which Defendant had access.

79. Plaintiff is very careful about sharing her sensitive PII/PHI. Plaintiff stores any documents containing her PII/PHI in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII/PHI over the internet or any other unsecured source. Plaintiff would not have entrusted her PII/PHI to Angels Care Home Health and Defendant had she known of Defendant's lax data security policies.

80. In order to obtain employment from Angels Care Home Health and Defendant, Plaintiff was required to provide her PII/PHI to Angels Care Home Health and Defendant, including, among other things, her name, contact information, date of birth, Social Security number, driver's license number, financial account information, and nursing credentials and licenses.

81. As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impacts of the Data Breach. Plaintiff has spent significant time dealing with the Data Breach—including researching and verifying the legitimacy of the Data Breach, reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud—

valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

82. Plaintiff suffered actual injury from having her PII/PHI compromised as a result of the Data Breach including, but not limited to: (i) misuse of PII/PHI; (ii) spam calls and communications; (iii) invasion of privacy; (iv) theft of her PII/PHI; (v) lost or diminished value of PII/PHI; (vi) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) loss of benefit of the bargain; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to her PII/PHI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII/PHI.

83. Plaintiff suffered actual injury from the dramatic increase in spam, suggesting that her PII/PHI has been stolen and is now in the hands of cybercriminals.

84. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

85. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

86. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

***Consumers Prioritize Data Security***

87. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[17] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[18]

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[19]

c. 89% of consumers stated that "I care about data privacy."[20]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[21]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[22]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[23]

***Plaintiffs and the Proposed Class Suffered Common Injuries and Damages***

---

[17] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited Oct. 16, 2026).
[18] *Id*. at 3.
[19] *Id*.
[20] *Id*. at 9.
[21] *Id*.
[22] *Id*.
[23] *Id*. at 11.

88. Because of Defendant's failure to prevent the Data Breach, Plaintiffs and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their PII/PHI is used;

b. diminution in value of their PII/PHI;

c. compromise and continuing publication of their PII/PHI;

d. out-of-pocket costs from trying to prevent, detect, and recover from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identity theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen PII/PHI; and

h. continued risk to their PII/PHI—which remains in Defendant's possession—and is thus at risk of future breaches so long as Defendant fails to take appropriate measures to protect the PII/PHI.

***Substantially Increased Risk of Identity Theft and Fraud***

89. Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

90. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2(a).

91. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 16 C.F.R. § 603.2(b).

92. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the Dark Web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

93. The "Dark Web" is an unindexed layer of the internet that requires special software or authentication to access.[24] Criminals in particular favor the Dark Web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, Dark Web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the Dark Web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[25] This prevents Dark Web marketplaces from being easily monitored by authorities or accessed by those not in the know.

94. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, sensitive personal information like the PII/PHI at issue here.[26] The digital character of PII/PHI stolen in data breaches lends itself to dark web

[24] *What Is the Dark Web?*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-isthe-dark-web/ (last visited Oct. 16, 2026).
[25] *Id.*
[26] *What is the Dark Web?* – Microsoft 365, *available at* https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs, on the other hand, requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and other personal information.[27] As Microsoft warns, "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others." [28]

95. For example, when the U.S. Department of Justice announced their seizure of AlphaBay—the largest online "dark market"—in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity.[29] Marketplaces similar to the now-defunct AlphaBay continue to be "awash with [PII/PHI] belonging to victims from countries all over the world."[30]

96. The unencrypted PII/PHI of Plaintiffs and Class Members has or will end up for sale on the Dark Web because that is the modus operandi of hackers. In addition, unencrypted and detailed PII/PHI may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Plaintiffs' and Class Members' PII/PHI.

97. Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach

---

[27] *Id.*; *What Is the Dark Web?,* Experian, *available at* https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.
[28] *What is the Dark Web?* – Microsoft 365, *available at* https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.
[29] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018) https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/.
[30] *Id.*

victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the victim has suffered the harm.

98. In particular, the theft of Social Security numbers—in combination with other PII/PHI (e.g., name, address, date of birth)—provides cybercriminals with a "skeleton key" to commit rampant fraud and identity theft.

99. For example, cybersecurity expert Jim Stickley explained to Time Magazine that "[i]f I have your name and your Social Security number, and you haven't gotten a credit freeze yet, you're easy pickings . . . With that, you can do whatever you want . . . You can become that person."[31] For context, Jim Stickley is a "penetration tester" who is employed by businesses "to infiltrate their systems in order to find flaws they can fix before the bad guys exploit them."[32]

100. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

---

[31] Patrick L. Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME MAGAZINE (Aug. 5, 2019) https://time.com/5643643/capital-one-equifax-data-breach-social-security/.
[32] *Id*.

101. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[33]

102. It is within this context that Plaintiffs and all other Class Members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

103. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

104. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

105. Identity thieves can also use an individual's personal data and PII/PHI to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent

[33] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019) http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[34]

106. One example of criminals piecing together bits and pieces of compromised PII/PHI to create comprehensive dossiers on individuals is called "Fullz" packages.[35] These dossiers are both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of PII/PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen PII/PHI with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

107. The development of "Fullz" packages means that the PII/PHI exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers

---

[34] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited July 9, 2025).

[35] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

may not be included in the PII/PHI stolen by the cybercriminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and other Class Members' stolen PII/PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

108. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[36]

109. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Yet, Defendant failed to rapidly report to Plaintiffs and the Class that their PII/PHI was stolen. Defendant's failure to promptly and properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injuries by depriving them of the earliest ability to take appropriate measures to protect their PII/PHI and take other necessary steps to mitigate the harm caused by the Data Breach.

110. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

111. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the

---

[36] *2019 Internet Crime Report* (Feb. 11, 2020) FED. BUREAU OF INVESTIGATION, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited Oct. 16, 2026).

damage caused by the theft of their PII/PHI. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

112. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII/PHI. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

113. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

114. In 2024, a record 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e., a 211% increase year over year).[37]

115. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[38]

116. In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations have experienced cyberattacks.[39]

---

[37] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.
[38] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.
[39] *See* Jessica Davis, *90% Hospitals, Health Systems Faced Email-Based Cyberattack in 2019*, TECHTARGET (Mar. 11, 2020),

117. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

***Defendant Could Have Prevented the Data Breach***

118. Data breaches are preventable.[40] Indeed, the American Bar Association published a treatise titled the *Data Breach and Encryption Handbook* wherein the author explained that:

a. "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[41]

b. "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[42]

c. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [43]

119. Defendant could have prevented or mitigated the consequences of the Data Breach by implementing spam filters and anti-phishing software to detect and prevent phishing attempts,

---

https://www.techtarget.com/healthtechsecurity/news/366595127/90-Hospitals-Health-Systems-Faced-Email-Based-Cyberattack-in-2019 (last visited Oct. 16, 2026).

[40] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (2012).

[41] *Id.* at 17.

[42] *Id.* at 28.

[43] *Id.*

training employees to detect and report phishing attempts, implementing multi-factor authentication, employing software to detect unauthorized intrusions and the transfer of large volumes of data to third party networks, and disconnecting legacy servers containing PII/PHI from internet access and implementing clearing house practices to delete data it was no longer required to maintain. Defendant was negligent for failing to use these reasonable and industry standard data security measures.

***Defendant Failed to Follow FTC Guidelines***

120. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

121. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[44] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

122. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

---

[44] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

123. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

124. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

125. In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to its patients' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

126. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

127. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

128. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

129. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

***Defendant Violated HIPAA***

130. HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[45]

---

[45] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

131. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PHI is properly maintained.[46]

132. The Data Breach resulted from a combination of inadequacies showing Defendant failed to comply with safeguards mandated by HIPAA. Defendant's security failures include, but are not limited to:

a. failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b. failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c. failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d. failing to ensure compliance with HIPAA security standards by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

e. failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to

[46] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g. failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h. failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i. failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

133. Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations.

## CLASS ACTION ALLEGATIONS

134. Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII/PHI was compromised in Defendant's August 2026 Data Breach.

135. Excluded from the Class are Defendant, its affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any of Defendant's officers or directors, any

successor or assignee, and any Judge who adjudicates this case, including their staff and immediate family.

136. Plaintiffs reserve the right to amend the Class definition.

137. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

138. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control.

139. Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least one thousand members.

140. Typicality. Plaintiffs' claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

141. Adequacy. Plaintiffs will fairly and adequately protect the proposed Class's common interests. Their interests do not conflict with Class Members' interests. And Plaintiffs have retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

142. Commonality and Predominance. Plaintiffs' and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class-wide proceeding can answer for all Class Members. In fact, a class-wide proceeding is necessary to answer the following questions:

a. if Defendant had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's PII/PHI;

b. if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendant was negligent in maintaining, protecting, and securing PII/PHI;

d. if Defendant breached contract promises to safeguard Plaintiffs' and the Class's PII/PHI;

e. if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if Defendant unreasonably delayed in notifying Plaintiffs and the Class of the Data Breach;

g. if the Data Breach caused Plaintiffs and the Class injuries;

h. what the proper damages measure is; and

i. if Plaintiffs and the Class are entitled to damages, treble damages, and or injunctive relief.

143. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties

and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

## FIRST CAUSE OF ACTION
**Negligence and Negligence *per se***
**(On Behalf of Plaintiffs and the Class)**

144. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

145. Plaintiffs and the Class entrusted their PII/PHI to Defendant on the premise and with the understanding that Defendant would safeguard their PII/PHI, use their PII/PHI for business purposes only, and/or not disclose their PII/PHI to unauthorized third parties.

146. Defendant owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII/PHI in a data breach. And here, that foreseeable danger came to pass.

147. Defendant has full knowledge of the sensitivity of the PII/PHI and the types of harm that Plaintiffs and the Class could and would suffer if their PII/PHI was wrongfully disclosed.

148. Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiffs and Class Members' PII/PHI.

149. Defendant owed—to Plaintiffs and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the PII/PHI in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized access;

c. promptly detect attempts at unauthorized access; and

d. notify Plaintiffs and Class Members within a reasonable timeframe of any breach to the security of their PII/PHI.

150. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their PII/PHI, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

151. Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII/PHI it was no longer required to retain under applicable regulations.

152. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII/PHI of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

153. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiffs and the Class. That special relationship

arose because Plaintiffs and the Class entrusted Defendant with their confidential PII/PHI, a necessary part of obtaining services from Defendant.

154. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs and Class Members' PII/PHI.

155. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII/PHI entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiffs and the Class Members' sensitive PII/PHI.

156. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII/PHI and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII/PHI Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

157. Similarly, under HIPAA, Defendant had a duty to follow HIPAA standards for privacy and security practices so as to protect Plaintiffs' and Class Members' PHI.

158. Defendant violated its duty under HIPAA by failing to use reasonable measures to protect PHI and by not complying with applicable regulations detailed *supra*. Here too, Defendant's conduct was particularly unreasonable given the nature and amount of PHI that Defendant collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

159. The risk that unauthorized persons would attempt to gain access to the PII/PHI and misuse it was foreseeable. Given that Defendant holds vast amounts of PII/PHI, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII/PHI—whether by malware or otherwise.

160. PII/PHI is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII/PHI of Plaintiffs and Class Members and the importance of exercising reasonable care in handling it.

161. Defendant improperly and inadequately safeguarded the PII/PHI of Plaintiffs and the Class in deviation from standard industry rules, regulations, and practices at the time of the Data Breach.

162. Defendant breached these duties as evidenced by the Data Breach.

163. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' PII/PHI by:

a. disclosing and providing access to this information to third parties; and

b. failing to properly supervise both the way the PII/PHI was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

164. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII/PHI of Plaintiffs and Class Members, which actually and proximately caused the Data Breach and Plaintiffs' and Class Members' injury.

165. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs' and Class Members' injuries-in-fact.

166. On information and belief, the PII/PHI of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

167. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

168. And, on information and belief, Plaintiffs' PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

169. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII/PHI by criminals, improper disclosure of their PII/PHI, lost benefit of their bargain, lost value of their PII/PHI, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

170. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

171. Plaintiffs and Class Members were required to provide their PII/PHI to Defendant as a condition of receiving services and/or employment provided by Defendant. Plaintiffs and

Class Members provided their PII/PHI to Defendant or its third-party agents in exchange for Defendant's services and/or employment.

172. Plaintiffs and Class Members reasonably understood that a portion of the funds they paid and/or derived from their labor would be used to pay for adequate cybersecurity measures.

173. Plaintiffs and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

174. Plaintiffs and the Class Members accepted Defendant's offers by disclosing their PII/PHI to Defendant or its third-party agents in exchange for services and/or employment.

175. In turn, and through internal policies, Defendant agreed to protect and not disclose the PII/PHI to unauthorized persons.

176. Implicit in the parties' agreement was that Defendant would provide Plaintiffs and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their PII/PHI.

177. After all, Plaintiffs and Class Members would not have entrusted their PII/PHI to Defendant in the absence of such an agreement with Defendant.

178. Plaintiffs and the Class fully performed their obligations under the implied contracts with Defendant.

179. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain.

In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

180. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

181. Defendant materially breached the contracts it entered into with Plaintiffs and Class Members by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into its computer systems that compromised such information;

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic PII/PHI that Defendant created, received, maintained, and transmitted.

182. In these and other ways, Defendant violated its duty of good faith and fair dealing.

183. Defendant's material breaches were the direct and proximate cause of Plaintiffs' and Class Members' injuries (as detailed *supra*).

184. And, on information and belief, Plaintiffs' PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

185. Plaintiffs and Class Members performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

## THIRD CAUSE OF ACTION
**Unjust Enrichment**

**(On Behalf of Plaintiffs and the Class)**

186. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

187. This claim is pleaded in the alternative to the breach of implied contract claim.

188. Plaintiffs and Class Members conferred a benefit upon Defendant. After all, Defendant benefited from (1) using their PII/PHI to provide services and/or facilitate employment, and (2) accepting payment and/or using their labor to derive profit.

189. Defendant appreciated or had knowledge of the benefits it received from Plaintiffs and Class Members.

190. Plaintiffs and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

191. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII/PHI.

192. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

193. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and Class Members' (1) PII/PHI and (2) payment and/or employment because Defendant failed to adequately protect their PII/PHI.

194. Plaintiffs and Class Members have no adequate remedy at law.

195. Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

**FOURTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and the Class)**

196. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

197. Given the relationship between Defendant and Plaintiffs and Class Members, where Defendant became guardian of Plaintiffs' and Class Members' PII/PHI, Defendant became a fiduciary by its undertaking and guardianship of the PII/PHI, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs' and Class Members' PII/PHI; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

198. Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendant's relationship with them—especially to secure their PII/PHI.

199. Because of the highly sensitive nature of the PII/PHI, Plaintiffs and Class Members would not have entrusted Defendant, or anyone in Defendant's position, to retain their PII/PHI had they known the reality of Defendant's inadequate data security practices.

200. Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiffs' and Class Members' PII/PHI.

201. Defendant also breached its fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

202. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**PRAYER FOR RELIEF**

Plaintiffs and Class Members respectfully request judgment against Defendant and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as Class Representatives, and appointing their counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiffs and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiffs and the Class;

D. Awarding Plaintiffs and the Class damages including applicable compensatory, exemplary, punitive, and statutory damages, as allowed by law;

E. Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I. Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial for all claims so triable.

Dated: October 20, 2026

Respectfully submitted,

**Law Offices of**
**LIPPE & ASSOCIATES**

By: */s/ Emil Lippe, Jr.*
Emil Lippe, Jr. (SBN 12398300)
Park Place at Turtle Creek
2911 Turtle Creek Blvd., Suite 1250
Dallas, TX 75219
T: 214-855-1850
F: 214-720-6075
emil@texaslaw.com

Camile Alvarez
**STRAUSS BORRELLI PLLC**
One Magnificent Mile
980 N. Michigan Ave., Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
calvarez@straussborrelli.com

Gerald D. Wells, III (88277PA)
**LYNCH CARPENTER, LLP**
1760 Market Street, Suite 600
Philadelphia, PA 19103
T: 267-609-6910
F: 267-609-6955
jerry@lcllp.com

*Interim Co-Lead Class Counsel for Plaintiffs and the Proposed Class*